## No. 21-3075

# In the
# United States Court of Appeals
## for the Seventh Circuit

———————

ASTELLAS US HOLDING, INC. and ASTELLAS PHARMA US, INC.,

*Plaintiffs-Appellees,*

v.

FEDERAL INSURANCE COMPANY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:17-cv-08220
The Honorable **Franklin U. Valderrama**, District Court Judge

———————

## BRIEF OF PLAINTIFFS-APPELLEES
## ASTELLAS US HOLDING, INC. AND
## ASTELLAS PHARMA US, INC.

———————

Nicole C. Henning
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Phone: (312) 782-3939
Email: nhenning@jonesday.com

Mark J. Andreini
(application pending)
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
Phone (216)-586-3939
Email: mjandreini@jonesday.com

Peter D. Laun
*Counsel of Record*
JONES DAY
2727 N. Harwood St., Suite 500
Dallas, TX 75201
Phone: (214) 220-3939
Email: pdlaun@jonesday.com

***Counsel for Plaintiffs-Appellees
Astellas US Holding,
Inc. and Astellas Pharma US, Inc.***

ORAL ARGUMENT REQUESTED

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-3075

Short Caption: Astellas Pharma US, Inc. and Astellas US Holdings, Inc. v. Federal Insurance Co.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Astellas Pharma US, Inc. and Astellas US Holdings, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jones Day

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Astellas US Holding, Inc. is a wholly-owned subsidiary of Astellas Pharma, Inc.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

Astellas US Holding, Inc. owns 10% or more of the stock of Astellas Pharma US, Inc.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Nicole C. Henning    Date: 5/10/22

Attorney's Printed Name: Nicole C. Henning

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: [UPDATED] 110 N. Wacker Drive, Suite 4800

Chicago, IL 60606

Phone Number: 312.269.4158    Fax Number: 312.782.8585

E-Mail Address: nhenning@jonesday.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-3075

Short Caption: Astellas US Holding, Inc. v. Federal Insurance Company

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Astellas US Holding, Inc., Astellas Pharma US, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Jones Day

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      Astellas US Holding, Inc. and Astellas Pharma US, Inc. are wholly-owned subsidiaries of Astellas Pharma, Inc

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      Astellas Pharma, Inc. holds more than 10% of Astellas US Holding, Inc. and Astellas Pharma US, Inc.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Mark J. Andreini          Date: 5/11/22

Attorney's Printed Name:  Mark J. Andreini (application pending)

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  901 Lakeside Avenue, Cleveland, OH 44114

Phone Number: 216-586-3939          Fax Number: 216-579-0212

E-Mail Address: mjandreini@jonesday.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-3075

Short Caption: Astellas US Holding, Inc. et al. v. Federal Insurance Co.

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  ☑  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Astellas US Holding, Inc., Astellas Pharma US, Inc.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jones Day

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and Astellas US Holding, Inc. is a wholly-owned subsidiary of Astellas Pharma, Inc.

   Astellas Pharma, Inc. has no parent companies. (NEW)

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   Astellas Pharma, Inc., holds 10% or more of the stock of Astellas US Holding, Inc. (NEW)

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Peter D. Laun     Date: 11/30/2021

Attorney's Printed Name: Peter D. Laun

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address: 2727 North Harwood Street, Suite 500

    Dallas, TX 75201

Phone Number: 214.969.4530      Fax Number: 214.969.5100

E-Mail Address: pdlaun@jonesday.com

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>21-3075</u>

Short Caption: <u>Astellas US Holding, Inc. et al. v. Federal Insurance Co.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Astellas US Holding, Inc., Astellas Pharma US, Inc.</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Jones Day</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and    Astellas Pharma US, Inc. is a wholly-owned subsidiary of Astellas US Holding, Inc.

   <u>Astellas US Holding, Inc. is a wholly-owned subsidiary of Astellas Pharma, Inc. (NEW)</u>
   Astellas Pharma, Inc. has no parent company.
   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>Astellas US Holding, Inc. owns 10% or more of the stock of Astellas Pharma US, Inc. (NEW)</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Peter D. Laun</u>    Date: <u>11/30/2021</u>

Attorney's Printed Name:  <u>Peter D. Laun</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address:  <u>2727 North Harwood Street, Suite 500</u>

_____

Phone Number: <u>214.969.4530</u>    Fax Number: <u>214.969.5100</u>

E-Mail Address: <u>pdlaun@jonesday.com</u>

rev. 12/19 AK

## TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................1

ISSUE PRESENTED FOR REVIEW ..............................................1

INTRODUCTION .........................................................................1

STATEMENT OF THE CASE .......................................................3

    A.    Response to Certain of Federal's Factual Assertions. ..................3

    B.    The Office of the Inspector General Advises Pharmaceutical Companies that Certain Donations to Charities that Provide Copay Assistance to Medicare Beneficiaries May Implicate the Anti-Kickback Statute...........................................6

    C.    Beginning in 2012, Astellas Made Donations to Two Independent Charities that Provided Copay Assistance to Financially Needy Patients Suffering from Prostate Cancer........7

    D.    DOJ Initiates an Investigation of Astellas's Donations to Independent Charity PAPs. .......................................................11

    E.    Astellas and DOJ Negotiate a Settlement. .................................14

    F.    Federal's Policy Provides Broad Coverage for Liability for Alleged, Unproven Wrongful Acts, Including Alleged, Unproven Violations of Law.........................................................16

    G.    The Proceedings in the District Court......................................17

SUMMARY OF THE ARGUMENT ..............................................22

STANDARD OF REVIEW...........................................................24

ARGUMENT ..............................................................................24

I.    Under Illinois Law, Federal has the Burden to Prove that the Settlement Payment Falls Under the Policy's Exclusion for Matters "Uninsurable Under Applicable Law."....................................24

II.    The Settlement Payment Constitutes Insurable Compensatory Damages. .................................................................................27

    A.    The Settlement Amount Is Insurable Under Illinois Law Because It Resolved a Claim for Compensatory Damages.........27

i

## TABLE OF CONTENTS
(continued)

B.  The Compensatory Damages DOJ Sought to Recover from Astellas Were Not "Restitutionary in Character." ...................... 33

C.  The Designation of $50 Million of the Settlement Amount as Tax Deductible Restitution Demonstrates that the Settlement Amount Represents *Damages*, Not *Disgorgement.* .............................................................. 36

D.  Case Law Finding Disgorgement Is Not "Loss" or is Otherwise Uninsurable Under Illinois Law is Inapplicable. ..... 38

E.  DOJ Never Sought to Recover Money the Government Paid to Astellas Directly or Indirectly Through an "Intermediary." ................................................................... 43

III. Federal's Argument that "The Meaning Of 'Loss' in a Liability Policy Precludes Insurance for the Return of 'Fraud Proceeds'" is incorrect. ................................................................................ 49

IV. This Court Should Reject Federal's attempt to Mischaracterize the District Court's opinion. ................................................. 51

A.  In Finding That the Settlement Amount Was Not Disgorgement, the District Court Did Not Rely on the Lack of an Admission of Liability. ......................................... 51

B.  The District Court Properly Relied on *Santa's Best* to Reject Federal's Opposition to Astellas's Motion for Summary Judgment. .................................................. 54

C.  The District Court Never Suggested that the Settlement Amount Was "Loss" Because It Only Represented a Portion of Astellas's Profits. ...................................... 55

D.  The District Court's Discussion of the Remedies Available Under the FCA Was Not a "Lengthy Detour"—It Addressed Federal's Incorrect Argument Regarding Those Remedies. ........ 56

E.  Federal's Assertion that the District Court Decision Should Be Reversed Because It Rejected Federal's "Indirect" Disgorgement Argument Is Wrong. ............................................. 57

# TABLE OF CONTENTS
(continued)

**Page**

V.    The Arguments Raised By The Supposed *Amicus Curiae* Have No Basis Or Merit...................................................................... 59

CONCLUSION ................................................................................. 62

# TABLE OF AUTHORITIES

Page

C<small>ASES</small>

*Allstate Ins. Co. v. Smiley,*
659 N.E.2d 1345 (Ill. App. Ct. 1995) ............................................. 50

*Bank of the W. v. Superior Ct.,*
833 P.2d 545 (Cal. 1992) ................................................................ 43

*Braye v. Archer–Daniels–Midland Co.,*
676 N.E.2d 1295 (Ill. 1997) ........................................................... 26

*Call One, Inc. v. Berkley Ins. Co.,*
No. 21-CV-00466, 2022 WL 580802 (N.D. Ill. Feb. 25, 2022) ..................... 28

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................ 27

*Chemical Bank v. Paul,*
614 N.E.2d 436 (Ill. App. Ct. 1993) ............................................... 54

*City of Marion, Ill. v. U.S. Specialty Ins. Co.,*
No. 12–CV–0999–SCW, 2013 WL 1834609 (S.D. Ill. Apr. 30,
2013) ................................................................................................ 43

*Gulliver's East, Inc. v. California Union Ins. Co.,*
455 N.E.2d 264 (Ill. App. Ct. 1983) ............................................... 53

*Ill. Mun. League Risk Mgmt Ass'n v. City of Genoa,*
51 N.E.3d 1133 (Ill. App. Ct. 2016) ................................... 46, 47, 48

*In re Estate of Feinberg,*
919 N.E.2d 888 (Ill. 2009) ....................................................... 26, 49

*In re TransTexas Gas Corp.,*
597 F.3d 298 (5th Cir. 2010) .......................................................... 43

*Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*,
    849 F.3d 355 (7th Cir. 2017)............................................................. 24

*Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*,
    522 N.E.2d 758 (Ill. App. Ct. 1988)........................................... 24, 25

*Jones v. Union Pac. R. Co.*,
    302 F.3d 735 (7th Cir. 2002)............................................................. 26

*Level 3 Commc'ns, Inc. v. Federal Ins. Co.*,
    272 F.3d 908 (7th Cir. 2001)................................................. 38, 39, 41

*Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five
    Star Managers, L.L.C.*,
    735 N.E.2d 679 (Ill. App. Ct. 2000)........................................... 41, 42

*Mierzycki v. Am. Fam. Mut. Ins. Co.*,
    No. 1-13-2249, 2014 WL 3827673 (Ill. App. Ct. Aug. 4, 2014)................... 26

*Miner v. Bray*,
    513 N.E.2d 580 (Ill. App. Ct. 1987)................................................ 25

*Philadelphia Indem. Ins. Co. v. Sabal Ins. Grp., Inc.*,
    786 F. App'x 167 (11th Cir. 2019) ................................................... 51

*Phoenix Ins. Co. v. Rosen*,
    949 N.E.2d 639 (Ill. 2011)............................................................... 26

*Rabin v. Karlin & Fleisher, LLC*,
    945 N.E.2d 681 (Ill. App. Ct. 2011)................................................ 26

*Raintree Homes, Inc. v. Vill. of Long Grove*,
    807 N.E.2d 439 (Ill. 2004)............................................................... 31

*Rutgens Distribs., Inc. v. U.S. Fid. & Guar. Co.*,
    419 N.E.2d 59 (Ill. App. Ct. 1981).................................................. 25

*Ryan v. Commodity Futures Trading Comm'n*,
    125 F.3d 1062 (7th Cir. 1997).................................................... 60, 61

*Ryerson Inc. v. Federal Ins. Co.*,
  676 F.3d 610 (7th Cir. 2012).................................................. 40, 41

*Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*,
  611 F.3d 339 (7th Cir. 2010)....................................................... 54

*St. Michael's Orthodox Cath. Church v. Preferred Risk Mut. Ins.
  Co.*,
  496 N.E.2d 1176 (Ill. App. Ct. 1986)........................................... 25

*St. Paul Fire & Marine Ins. Co. v. Village of Franklin Park*,
  523 F.3d 754 (7th Cir. 2008)................................................... 57, 58

*St. Paul Mercury Ins. Co. v. Foster*,
  268 F. Supp. 2d 1035 (C.D. Ill. 2003)........................................... 43

*Strategic Cap. Bancorp, Inc. v. St. Paul Mercury Ins. Co.*,
  No. 10–CV–2062, 2015 WL 13598261 (C.D. Ill. Sept. 25, 2015) ............... 42

*Traveler's Ins. Co. v. Eljer Mfg., Inc.*,
  757 N.E.2d 481,491-92 (2001) .................................................... 24

*Twenhafel v. State Auto Prop. & Cas. Ins. Co.*,
  581 F.3d 625 (7th Cir. 2009)...................................................... 24

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
  393 F.3d 1321 (D.C. Cir. 2005).................................................... 29

*U.S. ex rel. Taylor v. Gabelli*,
  No. 03-CV-8762-PAC, 2005 WL 2978921 (S.D.N.Y. Nov. 4,
  2005) ...................................................................... 20, 28, 29, 30

*U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*,
  488 F. Supp. 2d 719 (N.D. Ill. 2007) ............................................ 30

*U.S. Fire Ins. Co. v. Beltmann North Am.*,
  703 F. Supp. 681 (N. D. Ill. 1988) ............................................... 55

*U.S. v. Rogan*,
  517 F.3d 449 (7th Cir. 2008)...................................................... 32, 33

*Virginia Mason Med. Ctr. v. Executive Risk Indem., Inc.*,
  No. C07-0636-MJP, 2007 WL 3473683 (W.D. Wash. Nov. 14.
  2007), *aff'd,* 331 F. App'x 473 (9th Cir. 2009)............................................ 58

*Voices for Choices v. Illinois Bell Tel. Co.*,
  339 F.3d 542 (7th Cir. 2003)......................................................... 61

*Westport Ins. Corp. v. M.L. Sullivan Ins. Agency, Inc.*,
  No. 15-C-7294, 2017 WL 56635 (N.D. Ill. Jan. 5, 2017) ............................ 43

## STATUTES

Fed. R. Civ. P. 56(e) ......................................................... 27

26 U.S.C. § 162(f) ....................................................... 15, 19, 36

42 U.S.C. § 1320a-7b (Anti-Kickback Statute)............................................. 6, 7

31 U.S.C. § 3729-33 (False Claims Act).....................................................passim

## OTHER AUTHORITIES

D. B. Dobbs & C. L. Roberts, *Law of Remedies, Damages-Equity-
  Restitution* § 3.1 (3d ed. 2018) .................................................... 31

## JURISDICTIONAL STATEMENT

Appellees Astellas US Holding, Inc. and Astellas Pharma US, Inc. (collectively, "Astellas") agree that the jurisdictional statement of Appellant Federal Insurance Company ("Federal") is complete and correct.

## ISSUE PRESENTED FOR REVIEW

Compensatory damages are insurable in Illinois, although disgorgement of the "proceeds of fraud" is not. Under the False Claims Act ("FCA"), the federal government may only seek to recover compensatory damages, not disgorgement of any gain received by the alleged violator. The issue presented for review is:

Did the District Court err in granting Astellas's motion for summary judgment and denying Federal's motion for summary judgment where Federal failed to present any evidence to support a jury finding that Astellas's settlement of the FCA claim asserted by the Department of Justice ("DOJ") constituted the disgorgement of fraud proceeds?

## INTRODUCTION

In 2019, Astellas paid $100 million (plus interest) (the "Settlement Amount") to settle allegations by the federal government that Astellas's donations to independent charity patient assistance programs ("Independent Charity PAPs") caused patients to submit "false claims" to Medicare in

violation of the FCA. The government measured its damages from these alleged "false claims" by the amount Medicare paid to pharmacies for prescriptions of Astellas's drug Xtandi where the patient had received copay assistance from those Independent Charity PAPs. However, the government did not seek to recover from Astellas any gain resulting from its donations (the amount of which, if any, is unknown); indeed, disgorgement of any such gain is not a remedy available under the FCA.

Federal argues that coverage for the Settlement Amount is barred by an exclusion in its policy for matters that are "uninsurable under applicable law" because it was the disgorgement of "fraud proceeds." However, the nature of the relief available to the government under the FCA (which only allows the recovery of compensatory damages), the undisputed evidence as to how the government calculated its damages (based on its losses, not Astellas's alleged gains), and the other record evidence (which does not establish that Astellas made *any* profit from its donations to the Independent Charity PAPs) conclusively refute this argument.

Accordingly, Federal's appeal fails because its attempt to recast the Settlement Amount as disgorgement is unsupported by either fact or law.

## STATEMENT OF THE CASE

A.     **Response to Certain of Federal's Factual Assertions.**

Federal invents or mischaracterizes certain facts in order to support its legal arguments or to portray Astellas in a negative light. Astellas briefly addresses the more significant mischaracterizations at the outset so the actual record is made clear.

Federal implies that it has been proven that "Astellas is a fraudster" and that Astellas "tricked" Medicare into making payments. But DOJ never proved anything of the sort, and Federal never attempted to prove these assertions in the proceeding below. Because it cannot cite any such findings, Federal simply fulminates. This Court should reject Federal's attempt to establish facts through nothing more than pure argument. As the record establishes, the Astellas personnel responsible for making the donations at issue vetted their actions with both in-house and outside legal counsel, including counsel for the charities. Moreover, there is no evidence that any person at Astellas intended to deceive or defraud anyone, and Federal points to none.

Federal asserts that Astellas's donations to Independent Charity PAPs provided patients suffering from prostate cancer "a purely financial incentive . . . to use [Xtandi]" and accordingly drove up demand for the drug "far beyond strictly medical-based justification." Br. 3. There is no evidence in the

3

record of a single Xtandi prescription that was not medically justified. To the contrary, Xtandi was available only through a doctor's prescription, and it was prescribed by physicians who individually assessed each patient's medical needs. In fact, a patient did not qualify for copay assistance for Xtandi from the Independent Charity PAPs unless a physician had already prescribed him the drug. Federal's unsupported aspersions about the lack of medically based justifications for Xtandi are particularly offensive given that Xtandi was being prescribed at the time as a drug of last resort to men with prostate cancer resistant to other treatment methods.

Federal's most significant distortion—central to its principal argument—is its entirely unsupported assertion that "the fraud damages suffered by the government here are the same as . . . the fraud proceeds that accrued to Astellas." Br. 45-46. There is no record evidence to support this contention. To the contrary, there is no evidence of a correlation between Medicare payments for allegedly "tainted" Xtandi prescriptions and the "proceeds" that accrued to Astellas as a result of its donations to the Independent Charity PAPs.

The argument that the government's loss was the same as Astellas's gain is based on the false premise that Medicare reimbursements to pharmacies and hospitals were somehow transferred to Astellas, and then

somehow returned to Medicare as a result of the settlement. That is wrong. Astellas sold Xtandi wholesale to specialty pharmacies and distributors, not to retail pharmacies, patients, hospitals, or the government. When Medicare later reimbursed pharmacies and hospitals for the cost of those prescriptions, that money remained with the entities filling the prescriptions; it was not transferred to Astellas.

Equally important, neither the government nor Federal ever tried to establish how much Astellas gained from its donations. *See infra* at 33-36, 38-43. That is because whether and to what extent Astellas's donations bolstered the price for Xtandi, increased prescriptions for Xtandi, or otherwise resulted in additional profits to Astellas is both unknown and irrelevant to Astellas's liability under the FCA. *See infra* at 27-33. DOJ sought (and could seek) only the *damages* the government sustained, not Astellas's profits or revenues resulting from its donations.

With those fundamental mischaracterizations of the record debunked, we now turn in this Statement of the Case to the record evidence and the District Court's decision.

**B.  The Office of the Inspector General Advises Pharmaceutical Companies that Certain Donations to Charities that Provide Copay Assistance to Medicare Beneficiaries May Implicate the Anti-Kickback Statute.**

The U.S. government began subsidizing the cost of prescription drugs under Medicare Part D in 2006. AA237.[1] Medicare Part D beneficiaries generally are required to contribute to the cost of these subsidized prescriptions through copayments or coinsurance ("copays"). *Id.* Copays are the amounts a Medicare beneficiary must pay for a covered drug after satisfying any plan deductible. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, prohibits a pharmaceutical company from paying or subsidizing any Medicare beneficiaries' copay obligation to purchase that company's drug.

In a November 2005 bulletin, the Office of the Inspector General ("OIG") advised that copay assistance to Medicare Part D beneficiaries provided by charitable organizations *controlled by pharmaceutical manufacturers* would violate the AKS. AA237. OIG further advised that donations made by pharmaceutical companies to other 501(c)(3) organizations, *not controlled* by pharmaceutical manufacturers (the situation here), *risked* violating the AKS in certain circumstances. *Id.* OIG did not,

---

[1] Citations to the Record on Appeal are to the contemporaneously filed Appellees' Supplemental Appendix ("SA"), to Appellant's short appendix ("A"), Appellant's Appendix ("AA"), or to the district court docket numbers ("R").

6

however, discourage all such donations. Instead, recognizing the importance to the healthcare safety net of continuing the financial assistance offered by pharmaceutical manufacturers to Medicare beneficiaries (who otherwise might not have been able to afford necessary drugs), OIG provided guidance as to how pharmaceutical manufacturers could lawfully continue making donations to "*bona fide*, independent charities[.]" *Id.* OIG stressed that Independent Charity PAPs must decide independently how and under what circumstances to provide copay assistance to Medicare beneficiaries. AA240.

## C.   Beginning in 2012, Astellas Made Donations to Two Independent Charities that Provided Copay Assistance to Financially Needy Patients Suffering from Prostate Cancer.

Astellas launched Xtandi in 2012. Xtandi was a new treatment for prostate cancer that had metastasized and that no longer responded to a hormone therapy or surgical treatment (castration) to lower testosterone. AA232. This type of prostate cancer is referred to as "metastatic castration-resistant prostate cancer" or "mCRPC." AA232 ¶ 6. Xtandi differs from other treatments for mCRPC because it works by blocking androgen receptors, and it is thus labeled an "androgen receptor inhibitor" or "ARI." *Id.* At this time, only two other prostate cancer drugs were ARIs. AA295-296; AA306.

Astellas sold Xtandi wholesale. AA267 ¶ 5(H). Pharmacies and hospitals filled Xtandi prescriptions, charged the patients required copays,

and then sought reimbursement for the remainder of the cost from the patient's insurer, including, where applicable, Medicare Part D. *Id.*

Astellas conducted market research to determine Xtandi's wholesale price. AA300. In July 2012, Astellas decided, based on that research, on the price it would charge for Xtandi. That wholesale price was 28% higher than a competing treatment for mCRPC (called Zytiga). AA332. It planned annual 5% price increases thereafter. *Id.*

In preparing for Xtandi's launch, John Liu, then Executive Director, Reimbursement & Market Access Strategy at Astellas, understood that many patients who were prescribed Xtandi were covered by Medicare, and accordingly a significant number of these patients would have difficulty affording Xtandi. AA265 ¶ 5(A). One approach to helping ease the financial burden to Xtandi patients was to contribute to copay assistance funds established by Independent Charity PAPs. *Id.*

In September 2012, Astellas donated money to a *pre-existing* patient assistance fund for mCRPC treatments run by the Chronic Disease Fund ("CDF"), an Independent Charity PAP. AA232 ¶ 7; AA266 ¶ 5(C); SA25. In January 2013, Astellas began donating to another *pre-existing* mCRPC fund run by another Independent Charity PAP, the Patient Access Network Foundation ("PANF"). AA266 ¶ 5(C); SA25. These two mCRPC funds,

however, often ran out of money and were then unable to provide financial help to mCRPC patients. AA266 ¶ 5(C).

In May 2013, Mr. Liu learned that PANF had opened a fund for patients who were prescribed cancer drugs with a radioisotope mechanism of action ("MOA"). AA266 ¶ 5(D). This gave Mr. Liu the idea of speaking to PANF and CDF about the possibility of setting up an MOA-based fund for ARIs. *Id.* The proposed new fund would provide copay assistance to patients being treated with ARIs, but would not generally apply to other drugs. *Id.* Mr. Liu believed that, because fewer patients would be seeking assistance from it, an ARI fund was less likely to run out of money than the then existing funds available to assist patients with Xtandi copays. AA266 ¶¶ 5(C),(D).

Both PANF and CDF undertook an independent legal and medical analysis regarding the propriety of opening an ARI fund. AA266 ¶ 5(E). Mr. Liu also sought approval from Astellas's in-house legal department before having Astellas agree to contribute to any ARI fund. *Id.* Astellas's legal department, in turn, obtained legal advice from outside regulatory experts (attorneys at Hogan Lovells). *Id.* In addition, Astellas's legal department spoke to outside counsel for both PANF and CDF, who each independently approved their respective client's opening of ARI funds. *Id.*

In June 2013, PANF and CDF opened separate ARI funds that reimbursed financially needy patients for ARI drugs used for the treatment of mCRPC, but not for other treatments for mCRPC. AA232 ¶ 7. Astellas donated to PANF's ARI fund between June 28, 2013 and December 10, 2013. AA346-347; AA353. Astellas donated to CDF's ARI fund between June 28, 2013 and September 3, 2013. AA346-347. In all, Astellas donated $16 million to the two ARI funds. AA347.

By 2014, however, Astellas was no longer donating to either ARI fund; instead, it donated only to PANF's more general mCRPC fund and later, in 2016, to PANF's even broader Metastatic Prostate Cancer fund ("MPC fund"). AA267 ¶ 5(F); AA348. Astellas contributed to PANF's MPC fund until the end of March 2016. AA311.

During the time that Astellas made these donations, patients applied to PANF and CDF for financial assistance for Xtandi and other drugs. AA267 ¶ 5(H). For a copay obligation to arise at all, of course, a patient had to have a prescription for a qualifying drug, such as Xtandi. PANF and CDF would decide independently whether to issue a grant to cover all or part of that patient's copay obligation. *Id.* In addition, in February 2014 PANF decided to transfer all unused money that Astellas had previously donated to the ARI funds to its more general mCRPC fund. AA347.

**D.     DOJ Initiates an Investigation of Astellas's Donations to Independent Charity PAPs.**

On March 3, 2016, DOJ issued a subpoena to Astellas. AA124-130. The subpoena demanded documents relevant to DOJ's investigation of alleged "Federal healthcare offenses" arising out of Astellas's charitable contributions to Independent Charity PAPs. AA125; AA130. Astellas retained Thomas Gallagher, a former AUSA, to defend it. AA231¶¶ 1, 3; AA232 ¶ 5.

Mr. Gallagher spoke with DOJ multiple times to discuss DOJ's claims and to convey Astellas's positions regarding those claims. AA265 ¶ 4; AA268-269 ¶¶ 10-12. It was apparent early in the investigation that DOJ was conducting an industry-wide investigation into pharmaceutical company donations to Independent Charity PAPs. SA12-13 at 42:9-43:23. DOJ's theory was that pharmaceutical companies were using these charities as conduits for impermissibly subsidizing copays for their drugs. AA232-33 ¶ 7; SA14 at 115:20-116:3.

In April 2017, DOJ interviewed Mr. Liu. AA265 ¶ 4. During that proffer session, Mr. Liu stated that the primary purpose of Astellas's donations to PANF and CDF was charitable, intended to ensure patients' access to life-extending drugs. *Id.*; AA267 ¶ 5(G). Mr. Liu acknowledged that he *hoped* that there would also be a financial benefit to Astellas from its donations. AA267 ¶ 5(G). However, he stated that Astellas never asked him

11

to calculate—and he never calculated—a return on investment ("ROI") on these donations. *Id.*

In September 2017, DOJ issued a Civil Investigative Demand ("CID") to Mr. Liu. AA267 ¶ 6; AA313-316. The CID stated that it "was issued pursuant to the False Claims Act, 31 U.S.C. § 3729-33, in the course of a False Claims Act investigation" of Astellas to determine whether Astellas had caused the "submission of false claims to federal government health care programs, in violation of 31 U.S.C. § 3729, by facilitating payments to federal health care beneficiaries." AA314.

DOJ investigated all of Astellas's donations to PANF and CDF to determine if they constituted "kickbacks" to Medicare beneficiaries under the AKS. AA232-233 ¶ 7; AA268 ¶ 10. However, DOJ was particularly concerned about the donations that Astellas made to the ARI funds. DOJ claimed that Astellas's donations to these "ARI funds" violated the AKS because "the [ARI] funds covered only ARIs, and because the other ARIs on each fund's formulary were either generic or had very low market shares, Astellas knew that Xtandi would likely account for the vast majority of utilization from each fund" and that "Xtandi patients received nearly all of the assistance from the ARI funds at PANF and CDF." AA217 ¶ E.

DOJ did not allege, and certainly offered no proof, that any Xtandi prescriptions were medically unnecessary. In fact, some of the patients who received copay assistance were already taking Xtandi before ever applying to either PANF or CDF for copay assistance. AA269 ¶ 12.

On April 9, 2018, DOJ presented to Astellas's counsel a summary of the government's alleged damages, which totaled approximately $460 million. AA268 ¶ 10. DOJ measured those damages by the amount that Medicare paid pharmacies and hospitals for Xtandi prescriptions where the beneficiary received *any* copay assistance from either PANF or CDF. AA268 ¶ 10; AA318-319. For these purposes, DOJ did not consider whether the copay assistance led to any Medicare beneficiary using Xtandi who otherwise would not have. *Id.*

Moreover, DOJ never sought to have Astellas disgorge any profits that it generated by these allegedly impermissible donations, nor did it ever present any calculation of the profits that Liu "hoped" these donations would generate. Rather, the government sought to be compensated for *its own loss*. AA268 ¶ 10; AA326 at 137:11-19. The actual amount that Astellas allegedly gained, if anything, as a result of making these donations was simply irrelevant to the amount of damages sought by DOJ.

On June 5, 2018, Mr. Gallagher presented Astellas's position on damages to DOJ. AA269 ¶ 12; SA21-44. He argued that, even if there had been an FCA violation (which Astellas denied), the government's damages should be limited to the time during which copay assistance for Xtandi was provided through the ARI funds. AA269 ¶ 12. According to the government's own numbers, that amount was approximately $82 million. AA269-270 ¶ 14; SA44. Mr. Gallagher also argued that the government's damages should be further reduced by, among other things, the amount of Medicare reimbursements for patients who started taking Xtandi before the ARI funds were established (since a patient's continued use of Xtandi after Astellas began donating to those funds could not be attributed to the donations). AA269 ¶ 12. DOJ disagreed. AA269-270 ¶ 14.

## E.    Astellas and DOJ Negotiate a Settlement.

Later in June, Astellas and DOJ agreed to negotiate a resolution based on the framework outlined in Mr. Gallagher's June 5 presentation. On June 29, 2018, Astellas and DOJ agreed to settle DOJ's claims for $100 million. AA233-234 ¶ 11; AA243-244. DOJ and Astellas executed the final written settlement agreement on April 25, 2019 (the "Settlement Agreement"), and Astellas paid the full Settlement Amount that same day. AA50 ¶¶ 17-18; AA216-227; AA229.

The Settlement Agreement states that Astellas was to pay the United States $100 million, plus interest, and that "[o]f the Settlement Amount, $50,000,000 is restitution to the United States." AA248. The phrase "restitution to the United States" was part of DOJ's then-existing standard-form release for FCA settlements. SA7-9 at 28:10-30:3. Under 26 U.S.C. § 162(f), as amended by the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), DOJ had to approve what portion of the Settlement Amount would be tax deductible. AA270 ¶ 17; SA16-17 at 158:2-159:11. Specifically, the Tax Act prohibits individuals or entities from taking deductions "for any amount paid . . . to . . . a government or governmental entity in relation to . . . the investigation or inquiry by such government or entity into the potential violation of any law," 26 U.S.C. § 162(f)(1), *unless* the government agrees to identify the amounts paid as "restitution . . . for damage or harm which was or may be caused by . . . the potential violation of any law." *Id.* at § 162(f)(2)(A)(i)(I). Pursuant to the Tax Act, DOJ and Astellas agreed to identify $50 million of the $100 million settlement amount as "restitution to the United States," making it potentially tax-deductible. AA234 ¶ 12; AA248 ¶ 1.

Section E of the Settlement Agreement, titled "Covered Conduct," sets forth DOJ's allegations concerning Astellas's conduct. AA217. DOJ alleged

that Astellas used PANF's and CDF's ARI funds as conduits to funnel impermissible copay assistance to Xtandi patients, causing Medicare beneficiaries, pharmacies and hospitals to submit "false claims" for reimbursement to Medicare. AA217; AA232-233 ¶ 7. Astellas did not admit any of the allegations. AA233 ¶ 7.

## F. Federal's Policy Provides Broad Coverage for Liability for Alleged, Unproven Wrongful Acts, Including Alleged, Unproven Violations of Law.

Federal sold Astellas an excess liability policy covering claims made between April 1, 2015 to April 1, 2016 (the "Policy"). AA106; AA113. It provides a $10 million limit excess of $10 million in coverage issued by two different insurers, and a $500,000 self-insured retention. AA55; AA106; AA113.

The Policy incorporates and follows the coverage terms of a primary directors and officers liability policy issued by Starr Indemnity & Liability Company (the "Primary Policy"). AA113. The Primary Policy provides coverage for **Loss** arising from claims alleging **Wrongful Acts** by Astellas. AA69.

The term **Loss** is broadly defined to include "damages, settlements or judgments," as well as the "multiplied portion of any multiple damage awards . . . but only to the extent that such damages . . . are insurable under the applicable law most favorable to the insurability of such damages." AA71;

16

AA91. "**Loss** does not include: . . . (v) matters which may be deemed uninsurable under applicable law." AA71.

The term **Wrongful Act** is defined, in relevant part, as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company." AA72-73.

The Primary Policy also excludes coverage for liability "arising out of, based upon or attributable to any deliberate fraudulent act [by Astellas] or any willful violation of law" but only if "a final non-appealable adjudication . . . establishes that such act or violation occurred." AA95-96. The Policy neither contains nor incorporates any exclusion for **Claims** brought by or on behalf of the government or its agencies. *See generally* AA73-76; AA95-96. Nor does it expressly exclude claims alleging violations of the False Claims Act, an exclusion Federal could have included in the Policy—but did not. *Id.*

## G.    The Proceedings in the District Court.

At the time of the Settlement, Astellas and Federal were already embroiled in coverage litigation involving Federal's obligation to pay defense costs Astellas had incurred defending DOJ's claims. The Settlement overtook that dispute because the Settlement Amount alone exhausted the Policy.[2]

---

[2] Contrary to Federal's assertion that Astellas "abandoned" its claim for **Defense Cost** coverage, the parties stipulated that, in exchange for Astellas not

Following the Settlement, Astellas demanded that Federal provide Astellas its full limit of $10 million to help fund the Settlement Amount. R. 77 ¶ 2. Federal refused to pay anything. AA35 ¶ 46.

The parties filed cross-motions for summary judgment regarding coverage for the Settlement Amount, which focused primarily on Federal's uninsurability defense. R. 114, 129. After two years of discovery, Federal did not present any expert or fact evidence of profits Astellas allegedly earned due to the donations to the ARI funds, and the record contains none. Indeed, there is no evidence whatsoever in the summary judgment record regarding Astellas's profit margin (if any) when it sold Xtandi to specialty pharmacies, the amount that those sales increased (if any) as a result of the donations to Independent Charity PAPs, or how any profits or increased sales compared to the $16 million Astellas donated to the ARI funds.

The District Court granted Astellas' motion for summary judgment and denied Federal's, holding that "the Settlement Payment constitutes a **Loss** under the Federal Policy, and public policy does not bar coverage." A2.

In reaching that conclusion, the District Court first held that the insurer bears the burden of proof on a coverage limitation regardless of

---

seeking recovery of **Defense Costs**, Federal would drop any defense regarding the reasonableness of the Settlement Amount. R. 105 at 2.

whether the limitation is labeled as an "exclusion" or is contained elsewhere in the policy (here, the limitation in question—excluding "matters which may be deemed uninsurable under applicable law"—was found in the definition of **Loss**). A33. Federal does not assert error in this holding.

The District Court recognized that "[i]t is not disputed that, under Illinois law, disgorgement of ill-gotten gains is uninsurable." A34. It then examined whether Federal had met its burden of establishing that the Settlement Amount was in effect the "disgorgement of ill-gotten gains by Astellas." *Id.*

First, the District Court rejected Federal's argument that the label "restitution to the United States" in the Settlement Agreement was "persuasive evidence that the Settlement Payment was in fact restitution . . . for Astellas' unjust gains." A35-36. The District Court found that the ordinary meaning of "restitution" encompasses both disgorgement and compensation, and, more importantly, that the undisputed evidence established that the labeling of the Settlement Amount as "restitution" was done "to identify the tax-deductible portion of the settlement as required under [the Tax Code] 26 U.S.C. § 162(f)." A35-37.

Next, the District Court considered the remedies available to the government under the FCA. It found persuasive the Southern District of New

19

York's decision in *U.S. ex rel. Taylor v. Gabelli*, No. 03-CV-8762-PAC, 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005), which engaged in a comprehensive analysis of the FCA's damages provisions, legislative history, and relevant case law, "all of which 'leave no doubt that the FCA's remedial framework does not extend . . . to include disgorgement of unjust enrichment restitution.'" A39 (cleaned up). Instead, the remedy was limited to "make whole damages." *Id.* The District Court accordingly held that the FCA allows "only for civil penalties and compensatory damages, not for restitution in the form of disgorgement." A40.

The District Court next analyzed the record evidence regarding the government's asserted losses to determine whether the Settlement Amount in fact functioned as disgorgement, regardless of its classification under the FCA. It held that the undisputed evidence showed that "the theory of damages advanced by the Government under the FCA was [its] own loss in the form of Medicare payments to third parties (such as pharmacies and hospitals)." A44. Most importantly, the District Court held that nowhere in the record was there "a calculation of the profit Astellas made from its alleged wrongful Act." *Id.*

The District Court then rejected Federal's argument (made in opposition to Astellas's motion for summary judgment) that the release of

20

statutory and common law claims where disgorgement was an available remedy raised a genuine issue of material fact as to the insurability of the Settlement Amount. A49-A50. The District Court held that because Astellas had demonstrated that DOJ's "primary focus" was FCA claims for compensatory damages, the Settlement Amount was insurable. A50-51.

After concluding that, "because it constitutes damages" (A51), the Settlement Amount was covered **Loss** under the Policy, the District Court then considered Federal's argument that coverage was contrary to Illinois public policy on a different ground (which Federal has abandoned on appeal); namely, Federal's assertion that the Settlement Amount was uninsurable "because public policy prohibits insurance coverage for liability arising directly from an insured's intentional or willful acts." A51. In rejecting that argument, the District Court held that coverage of the Settlement Amount did not violate Illinois public policy because: (a) public policy bars coverage for recovery of the repayment of actual proceeds of a fraud, but it does not bar coverage for the *damages* allegedly caused by fraud (A54); (b) Illinois law does not prohibit coverage for claims involving mere *allegations* of fraud that settle before a trial, and the District Court was unwilling to "invent" such a public policy (A55); (c) there had been no final adjudication that Astellas had

engaged in deliberate fraud; and (d) "final adjudication" requirements in policy exclusions were enforceable under Illinois law (A58).

The District Court therefore granted Astellas's motion for summary judgment and denied Federal's motion. Federal timely appealed.

## SUMMARY OF THE ARGUMENT

Under Illinois law, Federal bore the burden to establish the applicability of exclusions—here, that the exclusion in the Policy for matters "uninsurable under applicable law" barred coverage for the Settlement Amount. As the moving party with the burden of persuasion on its motion for summary judgment, Federal had to submit credible evidence that would have entitled it to a directed verdict at trial. With respect to Astellas's motion for summary judgment, Federal, as the non-moving party, bore the burden of production to submit evidence showing there existed a genuine issue of fact for trial.

Federal failed to meet both burdens. It is true that, under Illinois law, disgorgement of ill-gotten gains is uninsurable. But that public policy does not apply here because the Settlement Agreement resolved a claim for *compensatory damages*. Under the FCA, the government was not entitled to seek disgorgement of ill-gotten gains. It could (and did) seek only compensatory damages. Thus, whether Astellas profited from its donations to

Independent Charity PAPs was irrelevant to the government's damages claim, which necessarily was based on the only damages it could seek to recover under the FCA: compensatory damages, measured by the government's claimed losses. Settlements that resolve claims for compensatory damages are, inarguably, insurable in Illinois. Indeed, they are precisely the type of claims that the Policy covers: claims alleging fraud that are not established by a "final adjudication."

Federal's argument that the Settlement Amount constitutes disgorgement of "fraud proceeds" relies entirely on the mistaken premise that what the government sustained as damages—in the form of Medicare payments to pharmacies for Xtandi—is the same as, or a subset of, the ill-gotten gains that Astellas supposedly achieved through its allegedly impermissible donations. But that premise is simply wrong: the government did not base the damages it claimed on Astellas's increased *profits or revenues* from sales of Xtandi caused by its allegedly impermissible donations, but rather only on *amounts Medicare paid to pharmacies and hospitals*. Indeed, as explained below, there is no record evidence that Astellas made *any* additional alleged profits as a result of the donations, much less that DOJ's damages claims were based on any such profits. Federal thus asks this Court to reverse the District Court's decision based on

23

a presumption, devoid of any record support, that Astellas profited from its donations to Independent Charity PAPs. This Court should decline to do so, and should affirm the District Court's judgment.

## STANDARD OF REVIEW

This Court's review of the District Court's summary judgment decision is *de novo*, "construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017).

## ARGUMENT

## I.  UNDER ILLINOIS LAW, FEDERAL HAS THE BURDEN TO PROVE THAT THE SETTLEMENT PAYMENT FALLS UNDER THE POLICY'S EXCLUSION FOR MATTERS "UNINSURABLE UNDER APPLICABLE LAW."

The parties agree that Illinois law governs the coverage dispute and that the interpretation of an insurance policy is a question of law. *See Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (citing *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 818–19 (7th Cir. 2008)). "Contracts of insurance are subject to the same rules of construction applicable to other types of contracts." *Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*, 522 N.E.2d 758, 764 (Ill. App. Ct. 1988). When construing an insurance contract, the "primary objective is to ascertain and give effect to the intent of the parties of the contract." *Traveler's Ins. Co. v.*

*Eljer Mfg., Inc.*, 757 N.E.2d 481,491-92 (2001) (citations omitted); *Int'l Minerals & Chem. Corp.*, 522 N.E.2d at 764 (same).

The policyholder bears the initial burden of demonstrating the existence of a claim that falls within the coverage provided by the policy. *Miner v. Bray*, 513 N.E.2d 580, 582 (Ill. App. Ct. 1987). The insurer then bears the burden of demonstrating that any exclusion upon which it relies clearly and unequivocally excludes coverage. *St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1178 (Ill. App. Ct. 1986). As the District Court held, the language in the definition of **Loss** excluding from coverage "matters that may be deemed uninsurable under applicable law" is an exclusion, on which Federal bears the burden of proof, notwithstanding that it is located in the **Loss** definition rather than the "Exclusions" section of the Primary Policy. A33; *see also Rutgens Distribs., Inc. v. U.S. Fid. & Guar. Co.*, 419 N.E.2d 59, 63 (Ill. App. Ct. 1981) ("[W]hether an insurer attempts to avoid policy coverage by relying on an express policy exclusion, or by relying on a clause which limits coverage through a narrow definition of the insured or the risk insured against, the

ultimate same result is accomplished."); *Mierzycki v. Am. Fam. Mut. Ins. Co.*, No. 1-13-2249, 2014 WL 3827673, at *4 (Ill. App. Ct. Aug. 4, 2014).[3]

In determining whether a contract provision violates public policy, courts consistently take into account Illinois' strong public policy favoring the freedom of private parties to enter into contracts and to have them enforced as written. *Braye v. Archer–Daniels–Midland Co.*, 676 N.E.2d 1295, 1301 (Ill. 1997); *Rabin v. Karlin & Fleisher, LLC*, 945 N.E.2d 681, 688-89 (Ill. App. Ct. 2011). Thus, a contract provision will not be invalidated unless it is *clearly* contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy of Illinois or unless it is manifestly injurious to the public welfare. *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 645 (Ill. 2011). The power to declare a provision of a private contract invalid on public policy grounds is to be exercised "sparingly" by courts in Illinois. *Id.* Illinois' public policy is to be discerned from its state constitution and statutes, as well as long-standing case law. *In re Estate of Feinberg*, 919 N.E.2d 888, 894 (Ill. 2009).

---

[3] Federal does not assert error in the District Court's holding that Federal bore the burden to demonstrate that the Settlement Amount is "uninsurable under applicable law." Federal therefore has waived any claim of error on that issue. *See Jones v. Union Pac. R. Co.*, 302 F.3d 735, 740–41 (7th Cir. 2002) (failure to address one of the district court's holdings amounts to waiver of any claim of error with respect to that issue which cannot be cured by argument in reply brief).

In the context of cross-motions for summary judgment, a party's burden of production shifts depending on whether it is the moving or non-moving party and whether it has the burden of persuasion at trial. Here, Federal would have the burden of persuasion at trial to prove that the Settlement Amount was uninsurable disgorgement. Accordingly, in support of its own motion for summary judgment, Federal had to present credible evidence— using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330–33 (1986) (Brennan, J., dissenting on other grounds). In opposing Astellas's motion, once Astellas had submitted affirmative evidence either negating this disgorgement defense or pointing out the lack of evidence supporting it, Federal had to come forward with credible evidence sufficient to demonstrate the existence of a "genuine issue" for trial. *Id.*; Fed. R. Civ. P. 56(e). As explained below, Federal failed to meet its burden of production with respect to both its own motion for summary judgment and in opposition to Astellas's.

## II. THE SETTLEMENT PAYMENT CONSTITUTES INSURABLE COMPENSATORY DAMAGES.

### A. The Settlement Amount Is Insurable Under Illinois Law Because It Resolved a Claim for Compensatory Damages.

Although it argued otherwise below (*see* R. 130 at 16-20), Federal now concedes that settlements of claims seeking *damages* are insurable under

Illinois law, even if those claims sound in fraud. Br. 23 ("Public policy does not allow for the insurance of fraud *proceeds* simply because it allows insurance for other types of fraud *damages*."); *id.* at 45 ("E. The Allowance Of Coverage For *Non*-Restitutionary Fraud Remedies Does Not Justify Coverage For *Restitutionary* Fraud Remedies"). Indeed, the Policy expressly covers **Loss** arising from **Claims** for fraud or intentional violations of the law unless there is a final adjudication of the excluded conduct. AA95-96.[4]

Accordingly, Federal's entire argument on appeal rises and falls on the premise that "Illinois law prohibits insurance for the disgorgement of ill-gotten gains such as fraud proceeds." Br. 20. While that general premise is undisputed, this public policy bar is inapplicable here because, as a matter of federal law and undisputed fact, Astellas settled a **Claim** by the government for *compensatory damages*, not a **Claim** seeking *disgorgement of fraud proceeds*.

Federal cannot rely on the FCA to establish that the government was seeking disgorgement. Indeed, Federal now concedes (just as multiple courts have held)[5] that the government cannot seek disgorgement of a violator's

---

[4] In any event, having not asserted error in the District Court's holding that Illinois public policy does not preclude insurance for unadjudicated fraud claims seeking damages, Federal has waived any claim of error on this issue.

[5] *See, e.g., U.S. ex rel. Taylor v. Gabelli*, No. 03-CV-8762-PAC, 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005), and cases cited therein. *See also Call One,*

gains under the FCA, which provides for no such remedy. Rather, the government can only seek to recover civil penalties, *damages* based on and measured by the government's losses, plus a multiple of those damages. Specifically, under § 3729(a) of the FCA, the maximum liability for a civil violation of the FCA is a civil penalty of not less than $5,000 and not more than $10,000 per violation, "plus 3 times *the amount of damages which the Government sustains* because of the act of that person." 31 U.S.C. § 3729 (emphasis added).[6]

In the leading case on this issue, a federal district court held, "the only allowable remedy the FCA grants . . . is compensatory damages and not restitution" or disgorgement. *Taylor*, 2005 WL 2978921 at *7. That court further explained that "the law of remedies . . . strikes a clear distinction between damages—a compensatory form of relief—and restitution—a form of

---

*Inc. v. Berkley Ins. Co.*, No. 21-CV-00466, 2022 WL 580802, *7 (N.D. Ill. Feb. 25, 2022) (holding that the Illinois False Claims Act, modeled on the FCA, allows only for recovery of "compensatory damages or actual loss, and not disgorgement, as a remedy").

[6] The FCA imposes two types of liability for civil claims. "First, the submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (citation omitted). Under the Settlement Agreement, Astellas paid no penalties. "[S]econd, the submitter of the claim is liable for damages that the government sustains because of the submission of the false claim." *Id.* (citation omitted).

relief that prevents unjust enrichment," and that "the FCA expressly refers to 'damages' and contains no 'restitutionary' provision." *Id.* at *3. The court further explained:

> "[D]isgorgement of improper profits" is a restitutionary remedy, . . . and "restitution is appropriate only where there has been a showing of unjust enrichment." Although restitution can be granted as a form of legal relief, it is generally considered an equitable remedy.
>
> The stated goal of the damages remedy is compensation of the plaintiff for legally recognized losses. This means that the plaintiff should be fully indemnified for his loss, but that he [cannot] recover[] any windfall.

*Id.* (citations omitted). Thus, the FCA is not a vehicle through which the government can pursue disgorgement or restitution of a violator's supposed ill-gotten gains. *Id.* at *7 ("Looking to the plain language of this provision and the 'ordinary, contemporary, [and] common meaning' of damages, the Court finds that the only allowable remedy the FCA grants [the relator] is compensatory damages and not restitution.") (citation omitted). *See also U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 732 (N.D. Ill. 2007) ("Disgorgement of profits is not a remedy recoverable under the FCA.").

This distinction between compensatory damages and restitution/disgorgement is well-established. As explained in a seminal treatise:

> Damages and restitution may coincidentally provide the same dollar recovery, but they are often triggered by

> different situations and always measured by a different
> yardstick. Damages always begin with the aim of
> compensation for plaintiff . . .. Restitution, in contrast,
> begins with the aim of preventing defendant's unjust
> enrichment. To measure damages, courts look at plaintiff's
> loss or injury. To measure restitution, courts look at
> defendant's gain or benefit, and not plaintiff's loss.

D. B. Dobbs & C. L. Roberts, *Law of Remedies, Damages-Equity-Restitution*

§ 3.1 (3d ed. 2018).

This same distinction between damages and restitution/disgorgement

has been recognized by the Illinois Supreme Court: "Damages differs from

restitution in that damages is *measured by the plaintiff's loss*; restitution is

*measured by the defendant's unjust gain.*" *Raintree Homes, Inc. v. Vill. of*

*Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) (quoting 1 D. Dobbs, Remedies §

3.1, at 278 (2d ed. 1993)) (emphasis added). Moreover, to Astellas's

knowledge, every court that has considered the issue has held that the only

damages remedy for a civil FCA violation is measured by the government's

loss, not the violator's "unjust gain."

Significantly, in cases involving "federal healthcare offenses"

implicating the FCA and AKS, courts have repeatedly held that the

government does not have to prove that the allegedly improper kickbacks

resulted in an unjust gain to the violator. Thus, the government can be

awarded "damages" under the FCA irrespective of such proof. Rather,

establishing liability under the FCA for an alleged "kick-back" scheme only

requires the government to prove that the violator caused the government to pay a claim that it would not have agreed to pay had it known the facts.

Why is this so? As explained by this Court in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), through Medicare, the government "offers a subsidy . . . with conditions," and those conditions include compliance with the AKS. *Id.* at 453. And "[w]hen the conditions are not satisfied" because of a violation of the AKS, "nothing is due" from Medicare. *Id.* In short, if the conditions required for the Medicare "subsidy" are not met, the government can assert that it was damaged to the full extent of the subsidy provided. *Id.* This is true even if the drug was supplied to a patient with an acute medical need for it, whether the drug would have been purchased by the beneficiary even without the impermissible copay subsidy, and even if the tainted sale did not result in a dime of profit to the violator. Thus, if a pharmaceutical company impermissibly funded a beneficiary's copay obligation, then the beneficiary's request for a Medicare subsidy is a "false claim" even if the impermissible copay did not affect the doctor's decision to prescribe the drug or the patient's decision to purchase it. In other words, it does not matter whether a pharmaceutical manufacturer profited from the "kickback" or to what extent: it matters only that the government sustained a loss.

Consistent with the proof required under *Rogan*, DOJ alleged that Astellas had violated the AKS by making improper donations to Independent Charity PAPs, thereby causing *all* claims for reimbursement of Xtandi made on behalf of Medicare beneficiaries receiving this copay assistance to be rendered "false" and unpayable. AA232-233 ¶ 7; AA268 ¶ 10. To use DOJ's words, Astellas allegedly used charitable donations to "facilitat[e] certain payments to federal health care beneficiaries." AA314. All prescriptions that had been subject to the allegedly impermissible copay assistance provided by PANF and CDF were, according to the government's theory, "tainted" by Astellas's donations, even if those donations had not increased the government's costs, and even if patients received a medically necessary and effective drug as a result of the claim. AA326 at 137:11-16.

## B.    The Compensatory Damages DOJ Sought to Recover from Astellas Were Not "Restitutionary in Character."

Because the Settlement Amount resolved a **Claim** seeking "compensatory damages," Federal is forced to argue that the Settlement Amount was, nevertheless, *restitutionary in character* because the Medicare payments that involved copay donations, on the one hand, and Astellas's profits, on the other, *were the same*. Federal even goes so far as to state that "[the government's] losses *were* [Astellas's] gain." Br. 4. The problem with

this argument is that it is not true, which is why Federal has presented no evidence to support it.

The DOJ investigation certainly did not uncover any such evidence. Federal focuses on the fact that DOJ lawyers asked Mr. Liu questions about Astellas's *motive* in making donations to the Independent Charity PAPs. However, notwithstanding this interest in Astellas's motive, whether Astellas in fact profited from the donations was completely irrelevant to both Astellas's liability and to the basis for, and amount of, the government's claimed damages. Accordingly, DOJ made no attempt to equate Astellas's "gain" from the donations to the ARI funds to the government's alleged "losses." As such, Federal's assertion that the Settlement Amount is "restitutionary in character" is unsupported by any record evidence.

To illustrate, Astellas could have sold Xtandi at a financial loss, and DOJ's damages claim would have been exactly the same, since its damages were measured exclusively by what the government paid to pharmacies, rather than by Astellas's allegedly unjust profits, if any, resulting from its donations to the ARI funds. DOJ made no attempt to calculate additional profits, if any, that Astellas "gained" from the donations because it did not need to do so to establish FCA liability or recoverable damages.

As the unrebutted evidence establishes, DOJ measured its damages exclusively by the amount Medicare paid to third parties—namely, the amounts Medicare paid to pharmacies and hospitals for Xtandi prescriptions during a limited time period. It never presented any other damages calculation. The amount of supposedly ill-gotten "gain," if any, that Astellas allegedly made from its donations to the ARI funds was and is unknown. In fact, the record shows that neither Astellas nor DOJ ever calculated or attempted to calculate Astellas's "return on investment" from the allegedly improper donations. Nor did Federal. Rather, it simply asks this Court to assume that Astellas's "ill-gotten gains" were at least the amount of the government's payments to third parties. Like the District Court, this Court should decline to leap into that evidentiary void.

In sum, Federal might have a better argument if it had presented admissible evidence proving that the government's "losses," *i.e.*, compensatory damages, were the same as the "gain" Astellas allegedly made as a result of its donations to the ARI funds. But it did not do so. *See infra* 46-48. And even Federal does not contend that it should prevail without establishing that "the victim's losses *were* the fraudster's gain." Br. 4.

C.    **The Designation of $50 Million of the Settlement Amount as Tax Deductible Restitution Demonstrates that the Settlement Amount Represents *Damages*, Not *Disgorgement*.**

Federal has now abandoned its argument below that the designation of $50 million of the Settlement Amount as "restitution to the United States" constitutes persuasive evidence that the Settlement Amount represents uninsurable disgorgement.[7] Wisely so, because the designation of $50 million of the Settlement Amount as "restitution to the United States" merely underscores that the Settlement Amount is *not* disgorgement. As Federal now concedes, the sole purpose of designating a portion of the settlement as "restitution" in the Settlement Agreement was to identify the single damages portion of the settlement for tax purposes. As required by the Tax Act, DOJ agreed to identify $50 million of the $100 million as "restitution to the United States" so that those sums were tax-deductible. SA7-10 at 28:3-30:5, 30:20-31:7.

Standing alone, the tax-deductible nature of $50 million of the Settlement Amount is not directly relevant to whether it is insurable under Illinois law. But, under § 162(f) of the Tax Act, an amount paid in settlement to the government is not tax deductible unless (and only to the extent that) it constitutes "restitution . . . for damage or harm . . . caused by the . . .

---

[7] Having not preserved that argument on appeal, it is now waived.

potential violation of law" and is identified in the settlement agreement as "restitution." Thus, as used in the Settlement Agreement and the Tax Act, the term "restitution" means compensation "for loss or injury" to the government.

Indeed, legal commentators have explained the purpose for designating a portion of settlements with the United States as "restitution":

> The statutory language of New Section 162(f)(2) (requiring the taxpayer to demonstrate that the payment is restitution "for damage or harm" caused by the violation (or potential violation)) and the historical positions taken by the IRS suggest that the IRS will require taxpayers to prove that payments eligible for this exception are paid to the victims and are measured by the loss of the victims. As a result, SEC disgorgement amounts, to the extent they are measured by the wrongdoer's unjust enrichment, will not be eligible for the exception.

https://www.clearyenforcementwatch.com/2018/02/1962/ (last visited May 9, 2022). Thus, by designating a portion of the Settlement as "restitution," DOJ agreed that at least $50 million was compensation for "loss or injury"—*i.e.*, compensatory damages.

In short, as the District Court correctly held, the designation of $50 million as "restitution to the United States" establishes that the Settlement Amount is *compensatory damages*, not uninsurable disgorgement. *See* A36-37.

**D.    Case Law Finding Disgorgement Is Not "Loss" or is Otherwise Uninsurable Under Illinois Law is Inapplicable.**

Federal relies heavily on cases holding that a policyholder suffers no "loss" if it is forced to return to the claimant money to which the policyholder had no legal right in the first place. However, as explained above, that case law is inapplicable here because the disgorgement of "fraud proceeds" (*i.e.*, "the fraudster's gain") is not a remedy available for civil violations of the FCA, and, in any event, Federal presented no evidence of the amount of the alleged "fraud proceeds." Furthermore, Federal has not cited and cannot identify a single case in which an Illinois court found damages for an FCA claim (or the similar Illinois False Claims Act, for that matter) were *per se* uninsurable. For that reason, each of the cases Federal cites is inapplicable.

For example, in *Level 3 Communications, Inc. v. Federal Insurance Co.*, 272 F.3d 908 (7th Cir. 2001), the policyholder (Level 3), sought coverage for a settlement of a securities fraud claim, where the plaintiff minority shareholders alleged that they had been tricked into selling their shares to Level 3 under "false pretenses" (an undisclosed intent by Level 3 to launch an IPO after acquiring plaintiffs' shares). The IPO greatly increased the value of those shares. "[T]he plaintiffs' suit sought to rescind the transaction and recover their shares, or rather the monetary value of the shares because their company can no longer be reconstituted." *Id.* at 910. Plaintiffs sought to

recover "the difference between the value of the stock at the time of trial and the price they received for the stock from Level 3." *Id.* In other words, it sought disgorgement only of the allegedly wrongful gain. Level 3 settled with the plaintiffs and sought coverage for the settlement payment.

This Court upheld the district court's grant of summary judgment to the insurer (Federal) because the *only* relief sought by the plaintiffs in *Level 3* was the return of an ill-gotten gain. A43. As this Court stated, plaintiffs in *Level 3* sought "to divest the defendant of the present value of the property obtained by fraud, minus the cost to the defendant of obtaining the property." *Id.* at 910-11.[8] That *is* disgorgement; *it requires Level 3 to divest the actual benefit it gained at the expense of the claimants* by paying them too little.

Unlike the return of the allegedly improper "net benefit" at issue in *Level 3*, there is no evidence suggesting, much less establishing (as Federal argues) that the damages DOJ sought from Astellas were "restitutionary in character." The sole remedy DOJ sought and could seek from Astellas under

---

[8] Level 3 apparently argued that "[a]s long as the case is settled before entry of judgment, the insured is covered regardless of the nature of the claim against it." *Id.* at 911. In response, Judge Posner stated, "That can't be right." *Id.* But this observation was based on the Court's determination that the *only* damages sought were not covered in the first place, so the absence of a final judgment was irrelevant. That is not the situation here.

the FCA was Medicare's losses, and there is no evidence that those alleged

losses equaled Astellas's alleged gain. *See supra* Section II(A).

*Ryerson Inc. v. Federal Insurance Co.*, 676 F.3d 610 (7th Cir. 2012),

does not support Federal's position for the same reasons *Level 3* does not. In

that case, Ryerson sold a group of subsidiaries to EMC Group, Inc. ("EMC")

for $29 million. The following year, EMC sued Ryerson, seeking rescission of

the sale and a *refund of the purchase price*. EMC alleged that Ryerson had

concealed an adverse development with a customer of one of the acquired

subsidiaries. EMC and Ryerson settled, with Ryerson agreeing to make "a

post-closing price adjustment" of $8.5 million "reflecting a change in the

purchase price paid by EMC to Ryerson for the purchase" of the troubled

subsidiary. *Id.* at 612. Thus, the settlement necessarily involved a refund by

Ryerson to EMC of a portion of the purchase price EMC had paid Ryerson as

a result of the allegedly fraudulent concealment.

Ryerson sought coverage for the settlement under a D&O policy issued

by Federal. After Federal denied coverage, Ryerson sued to recover the

$8.5 million that Ryerson had refunded to EMC. This Court sided with

Federal, holding that "EMC was seeking to recover a profit made at its

expense by Ryerson's fraud, which means that if the insurance company were

liable to Ryerson, Ryerson would get to keep profits of fraud. Having to

surrender those profits [the improperly received purchase consideration] was
not a 'loss' to Ryerson within the meaning of the insurance policy, as we held
in the nearly identical case of *Level 3 Communications, Inc. v. Federal Ins.
Co.*" *Id.* at 613. This makes sense, as Ryerson literally returned to EMC a
portion of the funds that EMC had paid Ryerson to purchase the subsidiaries.

Here, there was no "refund" of amounts paid by the government to
Astellas because the government never paid Astellas anything. Moreover,
DOJ never sought to have Astellas return the "profits of fraud," and it was
not entitled to seek that remedy for a civil violation of the FCA. It sought
compensatory damages.

Similarly, in *Local 705 International Brotherhood of Teamsters Health
& Welfare Fund v. Five Star Managers, L.L.C.,* 735 N.E.2d 679 (Ill. App. Ct.
2000), a health and welfare fund ("H&W") sought coverage from its fiduciary
liability insurer (the "Fiduciary Insurer") for a $20 million settlement
reached with a pension fund (the "Pension Fund"). In its lawsuits against
H&W, the Pension Fund sought only the return of $16,511,985 transferred
from the Pension Fund to H&W, a transfer that the Pension Fund claimed
was in violation of H&W's fiduciary duties. The settlement agreement
expressly stated that the $20 million payment consisted of the "return" by

H&W to the Pension Fund of $16,511,985.48 that was previously transferred from the Pension Fund to H&W, plus $3,488,014.52 in interest.

The Fiduciary Insurer denied coverage, resulting in coverage litigation. In holding that there was no coverage for the settlement, the Illinois Court of Appeals held that "there is no question that the sole basis upon which H&W paid out the settlement amount was the Pension Fund's claim that *H&W was required to return those monies which it had no right to possess in the first place*." *Id.* at 395 (emphasis added). Accordingly, the Court concluded that "[s]uch a payment can hardly be termed a loss." *Id.*

In contrast, DOJ was not claiming that Astellas had to "return" any amounts it "had no right to possess in the first place." DOJ never asserted that Astellas was not entitled to be paid by specialty pharmacies when Astellas sold Xtandi to them, and the Settlement Agreement does not require Astellas to "return" any "gain" that it might have received as a result of its donations to the ARI funds.

Indeed, all the cases relied upon by Federal (Br. 25-29) merely stand for the unremarkable proposition that one cannot insure against having to return an ill-gotten gain.[9] But here, Astellas never returned to Medicare the

_____

[9] *Strategic Cap. Bancorp, Inc. v. St. Paul Mercury Ins. Co.*, No. 10–CV–2062, 2015 WL 13598261, at *5 (C.D. Ill. Sept. 25, 2015) (settlement not covered because policyholder "was disgorging some (but not all) of the ill-gotten

"gain" resulting from its allegedly improper donations to the ARI funds.

Indeed, Federal submitted no evidence that Astellas *actually profited* from its

donations, let alone the amount of the "net benefit" or "ROI" from those

donations. The cases on which Federal relies are therefore wholly

inapplicable.

### E. DOJ Never Sought to Recover Money the Government Paid to Astellas Directly or Indirectly Through an "Intermediary."

Faced with the plain fact that the government did not seek

disgorgement of profits or revenues from Astellas, Federal is left only with

the contrived argument that the Settlement Amount is uninsurable because

it somehow *indirectly* divested Astellas of "fraud benefits." As Federal argues,

---

gains it obtained"); *St. Paul Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035, 1044 (C.D. Ill. 2003) ("restitutionary relief, that is relief intended to divest the insured of the net benefit of an unlawful act . . . is uninsurable because such protection would insure a thief against the cost to him of disgorging the proceeds of the theft" (cleaned up)); *Westport Ins. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, No. 15-C-7294, 2017 WL 56635, at *4-5 (N.D. Ill. Jan. 5, 2017) (suit seeking to "recover premiums collected and wrongfully withheld" fell under policy exclusion for "matters deemed uninsurable under the [applicable] law"); *City of Marion, Ill. v. U.S. Specialty Ins. Co.*, No. 12–CV–0999–SCW, 2013 WL 1834609, at *4 (S.D. Ill. Apr. 30, 2013) ("Under Illinois law, insurance will not cover the loss of wrongfully-retained amounts"); *Bank of the W. v. Superior Ct.*, 833 P.2d 545, 555 (Cal. 1992) ("to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law."); *In re TransTexas Gas Corp.*, 597 F.3d 298, 309-11 (5th Cir. 2010) (judgment that was "restitutionary in nature" because it involved repayment of "fraudulent transfers" and was therefore "uninsurable under Texas law").

"the government's Medicare payments passed through third parties on their way into Astellas's coffers" and thus Astellas now has "fraud proceeds" that it could, in theory, disgorge. Br. 22.

In the first instance, this "pass through" argument is unsupported by any record evidence. DOJ made no such claim, and the only record evidence establishes there was no "pass through." Astellas sold Xtandi wholesale to specialty pharmacies and distributors, without regard to whether any Xtandi prescription had yet been written or would ever be written, or who (if anyone) would pay the pharmacy for the Xtandi. Pharmacies and hospitals would, in turn, fill these prescriptions. They would then seek reimbursement from insurance, including Medicare. There is no evidence that any of these Medicare payments made their way "back to" Astellas's coffers, since the relevant sale by Astellas to the specialty pharmacies took place well before Medicare paid anything to the entities filling the prescriptions. Federal ignores this critical, unrebutted evidence.

In all events, Federal neither points to nor submitted any evidence that the donations to the ARI funds resulted in more prescriptions or a "net benefit" or "gain" to Astellas. Indeed, to establish such a gain, Federal would have had to present the District Court with evidence of the following (all of which is glaringly absent from the record):

- What is the cost to produce and distribute Xtandi?

- How much did Astellas's sales of Xtandi to specialty pharmacies increase (if at all) as a result of the copay assistance from the ARI funds?

- What portion of those increased sales (if any) were driven by prescriptions to Medicare beneficiaries?

- Did the increased profits (if any) from sales of Xtandi to specialty pharmacies due to Medicare beneficiary prescriptions exceed the $16 million in donations to the ARI funds?

- What was the actual amount of Astellas's "gain" or "net benefit" from its donations to the ARI funds?

Despite two years of discovery, Federal presented no evidence creating a triable issue on any of these facts. Instead, Federal is just asking this Court to assume, based solely on its lawyers' suppositions, that Astellas's supposed gain from its donations to the ARI funds was the same as Medicare's payments for Xtandi prescriptions allegedly "tainted" by those donations. But that conjecture has no record support.[10]

---

[10] Indeed, what evidence exists on the subject supports the opposite conclusion. Publicly available government data shows that after Astellas stopped making donations to the ARI funds, Medicare reimbursements for Xtandi increased dramatically. The Center for Medicare and Medicaid Services ("CMS") reports that Medicare Part D reimbursements for Xtandi were $232 million in 2013 (the year Astellas donated to the ARI funds), and then grew to $447 million in 2014 (the year after Astellas stopped donating to the ARI funds), to $663 million in 2015 (the last year it donated to PANF's mCRPC fund), and to $1.183 billion in 2018 (when Astellas made no donations). *See*

45

The only support Federal cites for its unestablished hypothesis is the "theme" DOJ raised in discussions with Astellas that Astellas's donations were made for the purpose of increasing sales of Xtandi. SA14-15 at 115:20-116:12. But evidence of Astellas's supposed intent to increase profits is not evidence that such profits materialized, much less of the amount of those profits. DOJ's "themes" cannot transform the type of relief the government *could* recover under the FCA (compensatory damages) to a different type of relief the government *could not* recover under the FCA (disgorgement).

Indeed, Illinois courts have explicitly rejected attempts (just like Federal's) to transform allegations (or even evidence) that a defendant acted to increase profits to *establishing* that the plaintiff's claims were for disgorgement. *Illinois Municipal League* illustrates why. *See Ill. Mun. League Risk Mgmt Ass'n v. City of Genoa*, 51 N.E.3d 1133 (Ill. App. Ct. 2016). There, the insurer (the "Association") sought a declaration that it had no duty to defend or indemnify its insured, the City of Genoa, against a lawsuit brought by the RTA against the City. In that lawsuit, the RTA alleged that the City, which was outside the RTA's taxing authority, had cooked up a scheme with a local company (the "Company") to move its sales office to the

---

Medicare Part D Spending By Drug (https://data.cms.gov/summary-statistics-on-use-and-payments/medicare-medicaid-spending-by-drug/medicare-part-d-spending-by-drug/data) (last visited May 9, 2022).

City and to report falsely that all its sales occurred in the City, when in fact the Company's sales occurred within RTA's taxing authority (which did not include the City). As a remedy, the RTA sought the tax revenue it lost as a result of the alleged scheme, as well as 1.5 times the amount of that lost tax revenue.

Relying on *Level 3*, *Ryerson*, and *Local 705*, the Association claimed that there was no "loss" because the RTA was attempting to disgorge improper gains received by the City based on the alleged scheme, and therefore the loss was uninsurable under Illinois law. The Circuit Court granted judgment to the Association; the City appealed. The Illinois Appellate Court reversed, holding that there was "no merit in the Association's disgorgement and restitution argument." 51 N.E.3d at 1137. It explained that "[w]hile RTA's complaint alleges the City 'received an unjustified windfall in sales tax revenue,' RTA does not allege it has any right to the sales tax revenue the City actually received from the Company's sales." *Id.* Accordingly, the Court of Appeals found both the lost sales tax revenue and the statutory damages (the 1.5x multiple of RTA's lost tax revenue) to be insurable loss under Illinois law:

> Neither of these counts sought restitution or disgorgement of the sales tax money the City received as a result of the Company's decision to claim the City as the situs of its sales. Instead, both of RTA's counts sought tax revenue no

47

> one ever collected. RTA does not claim it has any right to
> the sales tax revenue that was actually collected. In short,
> RTA is not seeking restitution from the City or trying to
> disgorge money from the City that belongs to RTA. As a
> result, the Association's reliance on *Local 705* [], *Level 3* [],
> and *Ryerson* [], is misplaced.

*Id.* At 1137-38.

Similarly, while DOJ asserted that Astellas made donations in order to

generate more profits, DOJ never claimed that it was seeking disgorgement

of those supposed additional profits or that it had a right to seek them under

the FCA. Instead, it sought only the losses sustained by Medicare as a result

of payments to third parties (pharmacies and hospitals).

Federal vainly tries to distinguish *City of Genoa*, arguing that the loss

claimed in that case was insurable because "the remedy did not divest the

city of ill-gotten gains that properly belonged to the plaintiff." Br. 43. While

that is certainly true, it proves Astellas's point: the Settlement Amount did

not divest Astellas of gains at all, and any (unproven) gains were irrelevant.

Further, DOJ did not claim that payments to Astellas by specialty

pharmacies for sales of Xtandi were improper, that the sale proceeds were not

Astellas's property, or that those sale proceeds had to be disgorged and

returned to the government. Just as in *City of Genoa*, Astellas did not

disgorge anything; it paid compensatory damages unrelated to its revenues

from sales to specialty pharmacies.

Indeed, Federal's entire "through-an-intermediary" argument is a bridge to nowhere because Federal has failed to present any evidence establishing that Medicare's payments to *anyone* for allegedly "tainted" prescriptions were the same as any supposed gain by Astellas. For example, even assuming for the sake of argument that Medicare paid Astellas directly for Xtandi prescriptions (which it did not), Federal has presented no evidence that the Medicare payments resulted in, or were equal to, any "gain" from the donations to the ARI funds. Nor does Federal point to any Illinois case law holding that compensatory damages are uninsurable merely because the underlying claim sounds in fraud. Both failures are dispositive here, where Federal bears the burden of persuasion to establish that the Settlement Amount is uninsurable as a matter of Illinois public policy under "long-standing" caselaw. *See In re Estate of Feinberg*, *supra*.

III. **FEDERAL'S ARGUMENT THAT "THE MEANING OF 'LOSS' IN A LIABILITY POLICY PRECLUDES INSURANCE FOR THE RETURN OF 'FRAUD PROCEEDS'" IS INCORRECT.**

Federal tries to bootstrap onto its uninsurability argument the additional argument that the disgorgement of fraud proceeds does not constitute "loss" under an insurance policy. This argument is based on two faulty premises.

First, as explained above, it relies on the false premise that the Settlement Amount constituted the disgorgement of the "fraud proceeds." As

explained in Section II, that is not the case here: the Settlement Amount resolved a claim for compensatory damages.

Second, this argument ignores the actual language of the Policy, which (unlike the policy in *Level 3*) defines the term **Loss** in a non-circular way. While the policy in *Level 3* used the term "loss" to define "Loss", the Policy here defines **Loss** in relevant part as "(1) damages, settlements or judgments; [and] (2) pre-judgment and post-judgment interest." Thus, the way in which courts have construed the term "loss" in an insurance policy when the term "Loss" is defined in a circular manner using the undefined term "loss" is irrelevant to the interpretation of the Policy's term **Loss**, which is not so defined. This Court must construe the term **Loss** as it is defined by the Policy's plain language, and not how that term is defined (and thus construed) in other policies. *See Allstate Ins. Co. v. Smiley*, 659 N.E.2d 1345, 1350 (Ill. App. Ct. 1995) (the terms of an insurance policy should be "read according to their plain and ordinary meaning.").

For this additional reason, cases such as *Level 3* that rely on the "ordinary meaning" of "loss" are not relevant here. Since the Settlement Amount falls within the express definition of **Loss** in the Policy, the only question for this Court to decide is whether Federal has presented evidence sufficient to carry its burden to establish that the Settlement Amount is

"uninsurable under applicable law." For the reasons explained above, Federal
has not carried that burden.

## IV. THIS COURT SHOULD REJECT FEDERAL'S ATTEMPT TO MISCHARACTERIZE THE DISTRICT COURT'S OPINION.

The remainder of the "errors" raised by Federal rely on distortions of
the District Court's rulings. These straw-man arguments do not provide any
reason to reverse the District Court's sound opinion.

### A. In Finding That the Settlement Amount Was Not Disgorgement, the District Court Did Not Rely on the Lack of an Admission of Liability.

Federal argues that the District Court erred because it rested its
holding that the Settlement Amount was covered on the fact that Astellas did
not admit liability. Br. 34-36. Federal says that the lack of any admission or
final adjudication is irrelevant to coverage, citing *Level 3* and the Eleventh
Circuit's decision in *Philadelphia Indemnity Insurance Co. v. Sabal
Insurance Group, Inc.*, 786 F. App'x 167 (11th Cir. 2019) (Florida law).
Federal's argument ignores the actual basis for the District Court's holding:
"Because the Court finds that the Settlement payment constituted damages
rather than restitution, it need not address the Parties' arguments regarding
the impact of the Primary Policy's Final Adjudication Exclusions." A44. As
the District Court correctly noted, compensatory damages were the only
remedy available under the FCA and the record evidence showed that DOJ
only sought to recover Medicare's loss, not Astellas's gain. That is the basis

51

on which the District Court distinguished *Level 3*, it never suggested, much less held, that the Settlement Amount was not "disgorgement" because Astellas did not admit liability or because there was no final adjudication. Thus, the fact that Astellas did not admit liability was irrelevant to the District Court's analysis of whether the Settlement Amount was uninsurable disgorgement.

Indeed, in the portion of the opinion discussing the final adjudication requirement in the fraud exclusion (A55-59), the District Court was addressing a different argument raised by Federal. Specifically, it reviewed and rejected Federal's *now-abandoned* argument that the Settlement Amount was uninsurable because, in order to establish liability under the AKS, the government had to prove that Astellas committed a "knowing" and "deliberate" violation of the law, and that such intentional torts are not insurable. The District Court rejected that argument for two reasons.

*First*, there is no Illinois public policy prohibition against insuring for claims alleging intentional wrongdoing. *Second*, under the language of the Policy, intentional tort claims are not excluded unless there is a final adjudication establishing a "deliberate fraudulent act" or a "willful violation of law." AA96. Although it had the opportunity to do so, Federal never attempted to adjudicate this issue below, since it has no record proof

establishing the applicability of the exclusion. The District Court accordingly held that mere allegations of intentional wrongdoing did not preclude coverage under the plain language of the Policy or Illinois public policy.

That holding was correct as a matter of fact and law. The Policy excludes coverage for claims alleging a deliberate fraudulent act only following a final adjudication on the merits establishing that act. Federal must now abide by the terms of its own Policy. Since it made no attempt to prove the facts supporting the exclusion in the District Court, Federal waived any attempt to try to prove that Astellas in fact received a profit or advantage to which it was not legally entitled.

Such final adjudication requirements are enforceable under Illinois law. Illinois courts have found against insurers on this basis. For example, in *Gulliver's East, Inc. v. California Union Insurance Co.*, 455 N.E.2d 264 (Ill. App. Ct. 1983), the insurance policy precluded the insurer from denying coverage based on an arson defense unless there was both an indictment and a conviction of the policyholder. The insurer argued that the clause violated public policy and that enforcing the policy language would encourage insureds to commit arson. In rejecting that argument, the Illinois Appellate Court held that the arson clause in the insurance policy at issue did not

offend Illinois public policy because the policy simply allocated how the alleged bad act must be proven. The same result is warranted here.

## B. The District Court Properly Relied on *Santa's Best* to Reject Federal's Opposition to Astellas's Motion for Summary Judgment.

Federal also criticizes the District Court's reliance on this Court's holding in *Santa's Best Craft, LLC v. St. Paul Fire & Marine Insurance Co.*, 611 F.3d 339 (7th Cir. 2010). But that portion of the District Court's opinion addresses another argument that Federal raised below but abandoned on appeal—specifically that DOJ could have sought disgorgement of profits under various common law theories of liability. In rejecting that argument, the District Court held that even if DOJ had pursued causes of action allowing for the disgorgement of gains in addition to its claim for compensatory damages (and the record establishes it did not), that would not have changed the outcome. As this Court held in *Santa's Best*, where the primary focus of an underlying action is an insured claim, the entire amount of the settlement is covered under Illinois law. Accordingly, because the undisputed record established that the only (and certainly primary) focus of DOJ's "case" was civil FCA liability, pursuant to which the government could only seek compensatory damages, the entire settlement was covered.[11] Put

---

[11] The other cases Federal cites have nothing to do with the issues here. In *Chemical Bank v. Paul*, 614 N.E.2d 436, 442 (Ill. App. Ct. 1993), the question before the court was whether a "waiver of defense" clause effectively disavowed

differently, the District Court held that even if DOJ had asserted claims for disgorgement *in addition to* claims for damages (which it did not), it would not have mattered, since the government's focus was the recovery of compensatory damages. A50-51.

## C.    The District Court Never Suggested that the Settlement Amount Was "Loss" Because It Only Represented a Portion of Astellas's Profits.

Next, Federal argues that the District Court "[found] coverage for Astellas's settlement payment on the ground that the payment did not encompass all the profits Astellas earned." Br. 37. Federal fails to identify where the District Court made this supposed ruling, citing only its discussion of the remedies available under the FCA. *See id.*, citing A37-40, 44. What the District Court actually held was that "all of the evidence establishes that the amount of the Settlement Payment was derived from the amount of 'tainted' prescriptions paid by Medicare to third parties, *not on any potential profits Astellas received based on its donations to the ARI Funds.*" A44 (emphasis added). This Court should reject this invalid criticism.

---

the implied covenant of good faith and fair dealing imposed on a contractual party. The court determined that it did not. And in *U.S. Fire Ins. Co. v. Beltmann North Am.*, 703 F. Supp. 681, 683 (N. D. Ill. 1988), in addressing a choice-of-law issue, the court determined that Illinois law should be applied to an insurance policy because "if Illinois public policy prohibits insurance against liability for Cash's claims, Illinois courts would not allow the parties to evade that policy by contracting for insurance in a state that does allow such coverage."

**D.    The District Court's Discussion of the Remedies Available Under the FCA Was Not a "Lengthy Detour"—It Addressed Federal's Incorrect Argument Regarding Those Remedies.**

Federal argues that the "district court's lengthy detour into the question whether the FCA authorizes remedies beyond the return of tainted government payments [] yields no answer relevant here." Br. 38. It is strange that Federal criticizes the District Court for addressing an argument that Federal raised below. *See, e.g.*, A39 ("Federal contends that the FCA was enacted specifically to provide 'restitutionary relief to the government for money taken from it by fraud.'"). In fact, the District Court reviewed all the case law Federal cited regarding what damages are recoverable under the FCA, and expressly rejected Federal's position that the *Taylor* case was incorrectly decided:

> [The] Court finds the reasoning in *Taylor* to be thorough and sound: it engages in a lengthy analysis of the FCA's damages provision, including statutory interpretation, an examination of the FCA jurisprudence and legislative history, all of which "leave no doubt that the FCA's remedial framework does not extend[] beyond 'make-whole' damages to include 'disgorgement of unjust enrichment' restitution.

Thus, what Federal derisively characterizes as a lengthy detour into irrelevance addressed a flawed argument that Federal made below, which it now wishes to sweep under the rug.

**E.    Federal's Assertion that the District Court Decision Should Be Reversed Because It Rejected Federal's "Indirect" Disgorgement Argument Is Wrong.**

Federal asserts that the District Court erred "in imposing what essentially amounts to a privity requirement," limiting the rule against insuring disgorgement to instances where the fraudster returns the "exact corpus of money" received from the victim. Br. 40-41.

First, as explained in Section II.E. *supra*, there was no disgorgement—indirect or otherwise—of money paid by Medicare to Astellas. Rather, the government simply sought its losses, based on the amounts Medicare paid to third parties irrespective of whether those amounts ever benefited Astellas.

Second, in rejecting this argument by Federal, the District Court merely held that under long-standing caselaw, Illinois public policy prohibits insurance only for actual disgorgement: i.e., the return to the plaintiff of money or property that the defendant received from plaintiff (whether directly or indirectly) to which it was not legally entitled. A43-44.

In making the argument that the District Court improperly limited the uninsurability rule to situations involving disgorgement of the defendant's actual gain, Federal misstates this Court's holding in *St. Paul Fire & Marine Insurance Co. v. Village of Franklin Park*, 523 F.3d 754 (7th Cir. 2008). Br. 41. In *Franklin Park,* the firefighters "sought payment into their pension fund of money they believed the Village had illegally put to other uses or

never collected in the first place." *Id.* at 756. And because "the remedy [for that claim] would be for Franklin Park to contribute money that it was legally required to contribute all along" the city did not suffer a loss, since it literally had to deposit into the pension fund money it had improperly retained. *Id.* at 757. This determination aligns with the Illinois disgorgement rule, because the plaintiff was seeking money to which it claimed the defendant was not legally entitled and which was owed to the plaintiff.

Those facts (and that case) have nothing to do with DOJ's claim against Astellas. DOJ did not allege that Astellas improperly retained funds it was supposed to have paid to Medicare, or that it had to "return" such funds to Medicare. Rather, the government sought the amount that Medicare had paid to third parties irrespective of whether Astellas received any funds directly or indirectly from Medicare as a result of its donations. *Franklin Park* therefore does not help Federal's cause; to the contrary, it demonstrates that for damages to be considered uninsurable disgorgement, the amounts sought by the plaintiffs must equal the amounts wrongfully retained or gained by the defendant. There is no evidence of such equivalence here.

Federal's attempt to distinguish *Virginia Mason Medical Center v. Executive Risk Indemnity, Inc.,* No. C07-0636-MJP, 2007 WL 3473683 (W.D. Wash. Nov. 14. 2007)*, aff'd,* 331 F. App'x 473 (9th Cir. 2009), which the

District Court cited with approval, fares no better. Federal argues that the case differs because, here, the government "obtained disgorgement of revenues Astellas received from the government's payment for Xtandi." Br. 44. Repeating this false mantra does not make it true: the only damages the government ever sought from Astellas were the government's claimed losses, not Astellas's supposed gain, which in all events *could not be claimed, much less recovered* under the FCA.

For all these reasons, Federal's attempts to attack the District Court's reasoning fail. The District Court correctly determined that the evidence established that the government's claims were not for disgorgement, but rather were (and only could have been) for compensatory damages. Accordingly, this Court should affirm the District Court's holding that Federal failed to meet its burden of showing that the Settlement Amount was uninsurable as a matter of Illinois law.

## V. THE ARGUMENTS RAISED BY THE SUPPOSED *AMICUS CURIAE* HAVE NO BASIS OR MERIT.

The *amicus* brief filed by the Coalition Against Insurance Fraud (the "Coalition") largely repeats the same factually and legally unsupportable arguments Federal makes. As an initial matter, it is worth questioning whether the Coalition qualifies as an *amicus*, since its members include Federal's parent company (Chubb), its counsel in the proceedings below

(Cozen O'Connor), and the law firm that filed the "amicus" brief (the Manning & Kass law firm). https://insurancefraud.org/members/ (last visited May 9, 2022). It therefore seems more likely that the Coalition is a "friend of Chubb" and its counsel rather than a "friend of the court." *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) ("The term 'amicus curiae' means friend of the court, not friend of a party.").

The Coalition then cites unverified and irrelevant statistics about the costs of insurance fraud that should be given the same weight given to *ipse dixit* statements by supposed experts: none. The question in this case is not whether consumers, pharmacies, insurance companies, or individuals commit Medicare fraud; rather, it is whether Federal has sustained its burden of proof to establish that the Settlement Amount, which resolved claims under the FCA for compensatory damages, is uninsurable under Illinois law. The Coalition's professed concerns about rampant Medicare fraud have nothing to do with that narrow issue.

Like Federal's, the Coalition's arguments are grounded in the unsupported assumption that the government established that Astellas engaged in fraud. *See* Coalition Br. 9, 11 ("the settlement was entirely based on Astellas's fraudulent activity" and "Astellas was involved in Medicare fraud"). In any event, arguing about facts of which it has no specialized

60

knowledge is not the proper role of a supposed *amicus*. *See Ryan*, 125 F.3d at 1064 ("We are not helped by an amicus curiae's 'strongly held view' about the weight of the evidence.") (citation omitted).

The Coalition's arguments should also be ignored as mere paraphrases or, in some instances, verbatim repetition of Federal's arguments. *Ryan*, 125 F.3d at 1063 ("The vast majority of amicus curiae briefs are filed by allies of litigants and duplicate the arguments made in the litigants' briefs, in effect merely extending the length of the litigant's brief. Such amicus briefs should not be allowed."); *Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 545 (7th Cir. 2003) ("[I]t is very rare for an amicus curiae brief to do more than repeat in somewhat different language the arguments in the brief of the party whom the amicus is supporting."). For example, the Coalition makes the same "indirect benefit" argument that Federal makes, using almost the same words. *Compare* Coalition Br. 5 to Br. 38-42. And in claiming that the Settlement Amount constituted uninsurable disgorgement, the Coalition relies on the same inapplicable cases as Federal, misapplying them in the exact same way. *Compare* Coalition Br. 14-15 to Br. 25-29.

In short, the Coalition's arguments fail for the same reasons as Federal's arguments: the Coalition ignores the limited remedy available under the FCA (*i.e.*, compensatory damages); it ignores how DOJ measured

Medicare's damages (*i.e.*, payments to third parties); it simply assumes, as if true, DOJ's and Federal's unproven allegations of fraudulent conduct; and it asks this Court to apply an erroneously expansive view of the Illinois rule barring insurance for disgorgement of ill-gotten gains.

## CONCLUSION

Federal failed to present any record evidence establishing that the Settlement Amount is barred by the Policy's exclusion for losses that are "uninsurable under applicable law." The limited scope of the relief available to the government under the FCA (which allows only compensatory damages), the undisputed evidence as to how the government calculated its loss, and the other record facts provide no support for Federal's argument that the Settlement Amount somehow represented the disgorgement of "fraud proceeds." For these reasons, the District Court's decision should be affirmed.

May 11, 2022                    Respectfully submitted,

                                */s/ Nicole C. Henning*
                                Nicole C. Henning
                                JONES DAY
                                110 North Wacker Drive, Suite 4800
                                Chicago, IL 60606
                                Phone: (312) 782-3939
                                Email: nhenning@jonesday.com

                                Peter D. Laun
                                *Counsel of Record*
                                JONES DAY
                                2727 N. Harwood St., Suite 500
                                Dallas, TX 75201
                                Phone: (214) 969-4530
                                Email: pdlaun@jonesday.com

                                Mark J. Andreini
                                (application pending)
                                JONES Day
                                901 Lakeside Avenue
                                Cleveland, OH 44114
                                Phone: (216) 586-3939
                                mjandreini@jonesday.com

                                *Counsel for Astellas US Holding, Inc.*
                                *and Astellas Pharma US, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned attorney for Appellant certifies that the foregoing brief:

(i)     complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 13,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

(ii)     complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 13-point Century.


Dated: May 11, 2022                        s/ Nicole Henning
                                           Nicole Henning

**CERTIFICATE OF SERVICE**

In accordance with Circuit Rule 25(a), I hereby certify that on May 11, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: May 11, 2022                    s/ Nicole Henning
                                       Nicole Henning